## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| In re Teflon Products Liability Litigation, **MDL NO. 1733** | :<br>:<br>: | **CASE NO.:  4:06-cv-00097-REL-CFB** |

| | | |
|---|---|---|
| SHELDON B. LYKE, DOROTHY M. JONES, ROMUALD C. WARKOMSKI PAULA BARDWELL, AND PAMELA INGRAM, AS INDIVIDUALS AND AS REPRESENTATIVES OF THE PLAINTIFF CLASS, | )<br>)<br>)<br>)<br>)<br>)<br>) | Previous Case No. 05 C 4168 (USDC ND IL) |
| Plaintiffs, | )<br>)<br>) | Hon. Judge Aspen |
| v. | )<br>)<br>) | Magistrate Judge Schenkier |
| E.I. DUPONT DE NEMOURS AND COMPANY | )<br>)<br>)<br>) | |
| Defendant. | ) | |

## SECOND AMENDED CLASS ACTION COMPLAINT
## FOR INJUNCTIVE AND MONETARY RELIEF

Plaintiffs, SHELDON B. LYKE, DOROTHY M. JONES, ROMUALD C.

WARKOMSKI, PAULA BARDWELL, and PAMELA INGRAM as individuals and as

representatives of the plaintiff class ("Class"), by and through their undersigned counsel, hereby

file this Amended Class Action Complaint for Injunctive and Monetary Relief against

Defendant, E.I. DUPONT DE NEMOURS AND COMPANY ("DuPont"), and allege:

## I.  INTRODUCTION

1.     This is a class action seeking monetary and other relief arising from DuPont's

deceptive and unfair trade practices in failing to disclose to the consuming public the potential

for serious public health, safety and welfare issues resulting from its manufacture and sale for

over fifty (50) years of a product commonly known as "Teflon."  Cooking products containing

Teflon can release harmful and dangerous substances, including a chemical that has been determined to be "likely" to cause cancer in humans, during the intended personal, family, household and commercial use for which those products were acquired or retained.

2.      DuPont manufactured and distributed Teflon when it knew that Teflon contains substances that were dangerous and harmful to persons and the environment that can be released when cooking products made with Teflon are used for their intended and foreseeable purposes.

3.      This action is brought to require DuPont (i) to create a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon; (ii) to require that DuPont provide a warning label on cooking products regarding the potential adverse and harmful effects of Teflon; and (iii) to pay damages to the Plaintiffs and other members of the Class ("Class Members") who are purchasers of cooking products containing DuPont's Teflon product .

## II.  JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. §1332 (a)(1) and (d)(2) in that this action seeks monetary relief in excess of $5,000,000.00, exclusive of interest, costs and attorney's fees and is between citizens of different States.

5.      Venue is appropriate in this judicial circuit pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Illinois.

### III.  REPRESENTATIVE CLASS PLAINTIFFS

6.      Plaintiff, Sheldon B. Lyke, is a resident of Cook County, Illinois and is the owner of cooking products containing or made with DuPont's Teflon product.

7.      Plaintiff, Dorothy M. Jones, is a resident of Cook County, Illinois and is the owner of cooking products containing or made with DuPont's Teflon product.

8.      Plaintiff, Romuald C. Warkomski, is a resident of Cook County, Illinois and is the owner of cooking products containing or made with DuPont's Teflon product.

9.      Plaintiff, Paula Bardwell, is a resident of Cook County, Illinois and is the owner of cooking products containing or made with DuPont's Teflon product.

10.     Plaintiff, Pamela Ingram, is a resident of Cook County, Illinois and is the owner of cooking products containing or made with DuPont's Teflon product.

### IV.  DEFENDANT

11.     DuPont is a Delaware corporation.  DuPont sells or distributes its products throughout the State of Illinois.

12.     DuPont is in the business of manufacturing and supplying Teflon for distribution, marketing, wholesaling and retailing in various products made for consumer use.  Included among these products are housewares, household appliances, and cooking products such as pots and pans.

### V.  BACKGROUND AND GENERAL ALLEGATIONS

13.     DuPont was founded in 1802.

14.     DuPont operates in more than seventy (70) countries.

15.     Teflon was invented in 1938 at DuPont's Jackson Laboratory.

16.     Teflon is DuPont's trademarked name for the chemical polytetrafluoroethylene (PTFE).

17.     DuPont has registered the Teflon trademark in 19 countries and first began selling Teflon commercially in 1946.

18.     As DuPont proudly boasts in its Teflon website:

> Teflon is really everywhere.  Not only can you find it in your clothes and on your cookware, but you can also find it on products on almost every continent.

19.     Teflon is commonly found in "non-stick" cooking products, such as in pots and pans, stir fryers and woks, pizza pans, breadmakers, cookie sheets, griddle pans and skillets, wafflers, deep fryers, crock pots, roasting pans, cake pans and molds, and other common cooking utensils and aids.

20.     Teflon and the chemicals used in its production represent a $2 billion per year industry.

21.     DuPont nets an estimated $200 million per year from its sale of Teflon.

22.     DuPont has advertised and represented to the public that Teflon makes life easy, and has called Teflon a "housewife's best friend."

23.     DuPont claims on its Teflon website that "the Teflon brand is one of the world's most recognized and respected of all ingredient brands" and that Teflon enhances consumer recognition.

24.     During the last fifty (50) years, DuPont's scientists have studied whether products containing Teflon are safe for use by consumers.  DuPont has continually represented to consumers in public statements and documents, in press releases and on its websites that Teflon is safe for consumer use and has denied that the use of cooking products containing Teflon pose any potential harm to human health.

25.     Perflourooctanoic acid ("PFOA") is a perflourinated detergent/surfactant that is manufactured, processed, and/or distributed by DuPont in connection with its manufacture of Teflon.  PFOA is also sometimes referred to by DuPont as C-8.

26.     PFOA is the chemical used to give Teflon its "non-stickiness."

27.     PFOA is a liver toxin in animals, is biopersistent in humans and animals and bioaccumulative in humans.

28.     PFOA is associated with other health concerns in animals, including cancer and developmental defects.

29.     PFOA is not naturally occurring but is nonetheless found to contaminate the blood of humans in all geographic regions of the United States.

30.     For example, a study released in 2001 by 3M Corporation found that PFOA was present in the blood of ninety six percent (96%) of the 598 children tested.  The children were located in 23 states.

31.     Studies have indicated that PFOA causes developmental toxicity and other adverse effects in animals.

32.     DuPont has conducted both animal and human studies and tests on PFOA.

33.     DuPont has knowingly represented to the general consumer market in public statements, advertisements and other writings, in press releases and on its websites, continually and within the past ten years, that no risks exist from use of cooking products coated with Teflon and has denied that the customary use of cooking products coated with Teflon risks any harm to human health.

34.     In 1981, however, 3M, a manufacturer of PFOA, advised DuPont that PFOA may cause birth defects in laboratory animals.

35.     Also in 1981, DuPont possessed a document describing the results of a blood sampling study DuPont conducted on eight (8) of its pregnant employees at the plant where PFOA is manufactured.  This document identified the levels of PFOA in the blood of DuPont's pregnant employees and described the status of the fetus.

36.     A purpose of DuPont's blood sample study was to monitor these pregnant employees for PFOA exposure, and to monitor umbilical cord blood for the presence of PFOA and to test the babies' blood for the presence of PFOA.

37.     The 1981 document demonstrates the presence of PFOA in the umbilical cord blood of at least one of the eight (8) DuPont employees and in the blood of another worker's baby.  Thus, DuPont knew from this study that PFOA moved from the mother, through the placenta, to the fetus.

38.     Similarly, documents maintained by DuPont chronicling the health of babies born to DuPont workers exposed to PFOA indicate birth defects in two (2) of seven (7) babies.  One child had eye and tear duct defects and the second had nostril and eye defects.

39.     In 1982, DuPont reported data to the EPA regarding the transplacental movement of PFOA in rats.  The EPA considered this information to be "substantial risk data."  DuPont failed to disclose to the EPA (or to consumers), however, that it had obtained human blood sampling data in 1981 that confirmed the transplacental movement of PFOA in humans and further failed to disclose to the EPA the information it had about the occurrence of birth defects (described below) in the babies of its female workers exposed to PFOA.

40.     The EPA contends that DuPont's human blood sampling information demonstrating the transplacental movement of PFOA "reasonably supports the conclusion that PFOA presents a substantial risk of injury to human health."

41.     More specifically, the EPA reads DuPont's human blood sample data on PFOA crossing of the human placental barrier as indicating the fetuses of PFOA mothers could experience toxic effects from PFOA, including bioaccumulation and, as observed in animal tests, developmental toxicity and liver toxicity.

42.     The EPA considers DuPont's human blood sampling study confirming transplacental migration of PFOA "to reasonably support the conclusion of a substantial risk of injury to health or to the environment."

43.     Moreover, the EPA considers DuPont's blood sample data confirming the transplacental movement of PFOA to be "known toxicological information" about PFOA.

44.     Among other things, as a result of DuPont's failure to disclose its 1981 blood sample data to the EPA, the EPA launched an investigation into DuPont's concealment of its study information and determined that DuPont engaged in unlawful behavior in concealing the blood sample study results.

45.     DuPont's concealment of its 1981 blood sample study information protected the continued marketability of Teflon and the profits received by DuPont from its sale of Teflon.  As the EPA pointedly states in its complaint against DuPont contending that DuPont violated the Federal Toxic Substances Control Act from June 1981 to March 2001 by not reporting health risks from exposure to PFOA:

> [the EPA's efforts to investigate the risks posed by PFOA] might have been more expeditious had the data on transplacental movement of the chemical in humans been submitted immediately by DuPont when DuPont obtained the information in 1981.

46.     DuPont has settled the claims brought by the EPA claiming it violated the Federal Toxic Substances Control Act.

47.     In May, 2005, however, a federal grand jury from the Justice Department's Economic Crimes Section issued a subpoena to DuPont regarding DuPont's use of PFOA.

48.     There are numerous additional facts and studies of which DuPont was aware demonstrating that exposure to PFOA causes adverse health effects.  PFOA has been linked to cancer, organ damage, and other negative health effects in tests on laboratory animals.  For example, male and female rats and mice have developed four different kinds of tumors when exposed to PFOA.

49.     Various studies have confirmed that exposure to PFOA causes or may cause vascular disease.  For example, it is reported that workers exposed to PFOA at 3M's plant in Cottage Grove, Minnesota, demonstrated a statistically significant, elevated risk of dying from cerebrovascular disease. Findings of vascular disease have also been reported in a study of DuPont workers exposed to PFOA.  Additionally, DuPont's study of the blood of its workers demonstrates a statistically significant correlation between cholesterol and PFOA.  Similarly, there was also a statistically significant correlation between cholesterol and PFOA found in a study of Italian workers exposed to PFOA.  Moreover, there are animal studies showing changes in blood chemistry associated with PFOA exposure that bolster these human study results.

50.     Studies have also shown that exposure to PFOA correlates to incidences of prostate cancer.  For example, workers at 3M's Cottage Grove plant exhibited a statistically significant association between the length of workplace PFOA exposure and prostate cancer mortality.  Moreover, an elevated risk of dying from prostate cancer was found among certain workers exposed to PFOA.  Additionally, workers at 3M's Decatur, Alabama, plant exhibited an increase in demand for medical care for male reproductive cancers (including prostate) compared

to the general population, with the greatest increases among those workers in the long-time, high-PFOA-exposure category.

51.     There are numerous other studies demonstrating many potential health risks related to exposure to PFOA.  Some of these include:

(a)     Two analyses of leukemia incidence were conducted from 1956-1989 showing statistically increased odds ratios for workers in DuPont's Washington Works plan from 1956-1989.  Additionally, a general mortality study found an increase in leukemia.

(b)     Workers exposed to perfluorochemicals at 3M's Decatur, AL plant exhibited significantly increased numbers of episodes of care for intestinal tumors versus those not exposed occupationally.  An elevated increase of risk of dying from cancer of the large intestine was also seen in those exposed to PFOA in 3M's Cottage Grove, MN plant compared to the general population.

(c)     At 3M's Cottage Grove, MN plant an elevated risk of dying from pancreatic cancer or pancreatic disease was seen among workers exposed to PFOA versus those not exposed occupationally.

(d)     At 3M's Cottage Grove, MN plant an elevated risk of dying from cancer of the testis or other male reproductive cancers was seen among workers exposed to PFOA versus those not exposed occupationally.

(e)     A 3M-sponsored animal study found a statistically significant increase in fibroademonas (mammary tumors) correlated with PFOA dose.

(f)     There are also studies that demonstrate PFOA may be related to adverse pituitary effects and immunological function.

52.     Over 40 years ago, DuPont conducted human experiments with Teflon-laced cigarettes to determine why certain workers were becoming sick on the job with a Teflon-related illness commonly called Polymer Fume Fever.  DuPont laced the cigarettes of its volunteers with Teflon and had the volunteers inhale the cigarette fumes until they became sick.  In these dosing experiments up to 90% of the people in the highest dose group became ill for an average of 9 hours, demonstrating flu-like symptoms, including chills, back ache, fever and coughing.  These

symptoms are commonly linked to Polymer Fume Fever.  DuPont acknowledges that Teflon
fumes can sicken people, causing Polymer Fume Fever.

53.     Moreover, aware of adverse effects on humans from inhaling heated particulates
and/or fumes emitted by Teflon, DuPont required its employees to wear respirators when
working with Teflon heated to 400°F (or more) while  in poorly ventilated areas.  Experiments
demonstrate that when cooking in the home, the surface of a Teflon coated pan can reach this
temperature within 2 minutes using a conventional stove top burner set on high.

54.     Reports indicate that a Teflon coated pan reached 721°F in just five minutes under
the same test.  DuPont studies show that Teflon emits toxic particulates at 446°F.  At 680°F
Teflon coated pans release at least six toxic gases, including two carcinogens, two global
pollutants, and MFA, a chemical lethal to humans at low doses.  At temperatures that DuPont
scientists claim are reached on stovetop drip pans (1000°F), non-stick coatings break down to a
chemical warfare agent known as PFIB, and a chemical analog of the WWII nerve gas *phosgene*.

55.     For the past fifty years DuPont has claimed that their Teflon coatings do not emit
hazardous chemicals through normal use.  In a recent press release, DuPont wrote that
"significant decomposition of the coating will occur only when temperatures exceed about 660
degrees F (340 degrees C).  These temperatures alone are well above the normal cooking range."
Reported tests show, however, that Teflon coated cookware exceeds these temperatures through
the common act of preheating a pan on a burner set on high.  The toxic particles and gases
emitted when Teflon heats and the temperatures at which these particles and gases are first
emitted, follow:

> 464°F – Ultrafine particulate matter:  Teflon produces very small (ultrafine)
> particles which cause extreme lung damage to rats within 10 minutes of exposure.
> Longer exposure causes death.
>
> 680°F – Tetrafluoroethylene (TFE): The National Toxicology Program considers

*tetrafluoroethylene* (TFE) to be a "reasonably anticipated" human carcinogen because it is known to cause cancer in laboratory animals.

680ºF – Hexafluoropropene (HFP): Exposure to fluorocarbons like HFP can lead to eye, nose and throat irritation; heart palpitations, irregular heart rate, headaches, light-headedness, fluid accumulation in the lung and possibly death. Long-term exposure is associated with decreased motor speed, memory and learning.  In mice and rats, inhalation of hexafluoropropene (HFP) causes kidney lesions, decreased numbers of a type of immune cell and increased urination. HFP also causes increased numbers of chromosomal abnormalities in hamster ovaries.

680ºF – Difluoroacetic acid (DFA):  Kidney toxicity from DFA has been reported in rats.

680ºF – Monofluoroacetic acid (MFA, fluoroacetic acid or compound 1080): Monofluoroacetic acid is toxic.  Doses as low as 0.7 to 2.1 mg/kg can kill people. Initially, people report nausea, vomiting, numbness, tingling, anxiety, muscle twitching, low blood pressure and blurred vision.  If exposure is high enough, people can have irregular heart rate, heart attacks and severe convulsions leading to respiratory failure.

680ºF – Perfluorooctanoic acid (PFOA):  The effects of PFOA are discussed throughout this Complaint.

878ºF – Silicon tetrafluoride (SiF4):  Silicon tetrafluoride is a highly toxic, corrosive gas.  In the lungs, moisture causes the silicon particles to separate, releasing toxic hydrofluoric acid and also coating the lung with silicon particles. Inhaling hydrofluoric acid can cause eye and throat irritation, cough, difficult breathing, bluish skin color caused by lack of oxygen, lung damage and fluid accumulation in the lung.  Long term exposure can cause weight loss, decreased numbers of red and white blood cells (anemia and leucopenia*)*, discoloration of the teeth and abnormal thickening of the bone.

887ºF – Perfluoroisobutene (PFIB):  Perfluoroisobutene (PFIB) is toxic. Inhalation can lead to fluid build up in the lung, a condition that can lead to death. PFIB is listed in the Chemical Weapons Convention as a *Schedule 2 compound*. PFIB is many times more toxic than phosgene, a highly toxic corrosive gas also listed as a chemical weapon.

932ºF – Carbonyl fluoride (COF2):  Breakdown of Teflon in the air is the major source of carbonyl fluoride exposure.  Carbonyl fluoride is the fluorine version of phosgene, a chlorinated chemical warfare agent.  Carbonyl fluoride fumes can irritate eyes, ears and nose.  More serious symptoms of exposure include chest pains, breathing difficulty, fluid accumulation in the lungs, weakness, liver damage and increased glucose levels.

932ºF – Hydrogen fluoride (HF):  Hydrogen fluoride (HF) is a toxic corrosive

gas, and can cause death to tissue it comes into contact with, including tissue in the lungs. Breathing HF can cause severe lung damage, such as fluid buildup in the lungs and inflammation of lung passages.

1112ºF – Trifluoroacetic acid fluoride (CF3COF): Trifluoroacetic acid fluoride is toxic when it breaks down into hydrogen fluoride and trifluoroacetic acid.

1112ºF – Octafluorocyclobutane (OFCB): Inhaling high levels of octafluorocyclobutane can cause heart beat irregularities, unconsciousness and death. People with pre-existing heart conditions may be extra vulnerable.

56.    The EPA has recently identified significant human health concerns from exposure to PFOA.

57.    On June 27, 2005, a panel of the EPA's Science Advisory Board ("SAB") released a draft of its conclusions after reviewing the EPA's report entitled "Draft Risk Assessment of the Potential Human Health Effects Associated with Exposure to Perfluorooctanoic Acid (PFOA)."

58.    A majority of members of the EPA's SAB concluded that PFOA was likely to cause cancer in humans. The SAB stated:

> that the experimental weight of the evidence with respect to the carcinogenicity of PFOA was stronger than [previously determined by the EPA], and suggested that **PFOA is a 'likely' carcinogen in humans**. According to the EPA's Guidelines for Carcinogen Risk Assessment (also known as EPA's Cancer Guidelines), this descriptor is typically applied to agents that have tested positive in more than one species, sex, strain, site or exposure route, with or without evidence of carcinogenity in humans.

59.    A recent Centers for Disease Control study showed that PFOA has contaminated the bloodstream of fetuses throughout the United States.

60.    DuPont executives nonetheless continue to claim that the use of Teflon in cooking products is completely safe.

## VI.  CLASS REPRESENTATION ALLEGATIONS

61.    A class action is appropriate pursuant to Fed. R. Civ. P. 23 (a), 23(b)(1)(A) and (B) and 23(b)(3).

62.    The Class that Plaintiffs represent is comprised of consumers who reside in the State of Illinois and who have purchased or otherwise acquired, and still own, one or more cooking products made with or containing Teflon.

63.    The size of these Classes is currently unknown but each is estimated to be in excess of 1,000,000 consumers.

64.    DuPont has knowledge of all licensees authorized to manufacture or sell cookware made with or containing Teflon and the brand and model names so marketed.  Upon information and belief, and subject to information obtainable only through pretrial discovery, DuPont licensed the use of Teflon to, among others, the following manufacturers and models of cookware:

| MFG. | MODELS |
|---|---|
| All Clad | Emerilware<br>LTD<br>Cop-R-Chef<br>Copper-Core<br>MC2 |
| Anolon | Anolon Titanium<br>Advanced<br>Classic<br>Professional<br>Suregrip Bakeware |
| Basic Essentials | |
| Bodum | |
| Chef's Planet | Arc-42 Cookware<br>Tefmat Oven & Bake Liners |

| | |
|---|---|
| Circulon | Circulon Total<br>Elite<br>Premier<br>DuPont Autograph<br>Circulon Electrics |
| Crestware | Dupont "Supra Select"<br>Platinum Pro<br>Silverstone Xtra<br>Silverstone Professional |
| Cuisinart | Chef's Classic |
| DuPont | Autograph<br>Plantinum Pro<br>Platinum Select<br>Xtra<br>Classic |
| Farberware | Farberware, Inc.<br>Farberware Millennium<br>Farberware Nonstick Aluminum<br>Restaurant Pro<br>Enhanced Nonstick Cookware<br>Select<br>Vibrance<br>Cooks Kitchen<br>Classic Series Nonstick Skillets<br>Farberware Nonstick Bakeware |
| GAU | |
| GSI Outdoors | Bugaboo |
| Kitchenaid | Gourmet Excellence<br>Gourmet Essentials |
| Megaware Inc. of California | Castalon<br>Castame<br>Triomphe<br>Concorde<br>Magnifica |
| Newell Rubbermaid | Calphalon |

| | |
|---|---|
| Royal Cougar | |
| Salton | |
| Silverstone | Culinary Colors Series<br>Nonstick Stainless Steel Series |
| T-Fal | Jamie Oliver Cookware |
| US Foodservice | Next Day Gourmet |
| Wearever | Mirro<br>Regal<br>Wearever |

65.     The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the Court.

66.     There are questions of fact and law common to the class and such common questions predominate over any individual questions of fact and law.

67.     There is a well-defined commonality of interest regarding the questions of law and fact affecting the Class.  Questions of law and fact common to the Class, among others, are:

a.     Whether the Class Members purchased or otherwise acquired a cooking product made with or containing Teflon.

b.     Whether DuPont represented to the public that Teflon or the use of Teflon coated cooking products was safe.

c.     Whether DuPont has denied and/or failed to disclose that Teflon or the use of Teflon coated cooking products can be potentially harmful to human health.

d.     Whether DuPont had in its possession animal or human test data indicating potential adverse health effects from exposure to one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products.

e.     Whether DuPont had knowledge or possession of blood sample test results of its workers indicating transplacental movement of one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products.

f.     Whether DuPont had knowledge or possession of data regarding deformities suffered by the children of female DuPont employees exposed to one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products.

g.     Whether DuPont had been notified by the EPA that evidence of transplacental movement of one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon coated cooking products in laboratory rats was "substantial risk data" of a potential human health risk.

h.     Whether DuPont knew or should have known, yet failed to disclose, that the heating of Teflon coated cooking products can cause the release of substances harmful or potentially harmful to human health.

i.     Whether DuPont knew or should have known, yet failed to disclose, that fumes from heated Teflon coated cooking products can sicken people.

j.     Whether the class representatives' claims are sufficiently similar to the claims of prospective Class Members.

68.     These common questions of law and fact are governed by the laws of the State of Illinois, where Defendant has engaged in its wrongful conduct, and predominate over questions that affect only individual Class Members.

69.     The claims of the Plaintiffs are typical of those of the Class.  The Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent them.  The Plaintiffs anticipate no difficulty

in the management of this litigation as a Class Action.  Accordingly, the Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

70.     A class action is the best available method for the fair and efficient adjudication of this controversy.  The Members of the Class are so numerous that the joinder of all Members is impracticable, if not impossible.  Because the harm suffered by individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation makes it impractical for Members of the Class to seek redress individually for the wrongful conduct alleged herein.  Should each individual Member of the Class be required to bring separate actions, the resulting multiplicity of lawsuits would cause undue hardship and expense on the Court and on the litigants.  The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interest of other Class Members who are not parties to the adjudications and/or may substantially impede their ability to protect their interests.

71.     To the extent such conditions exist, all conditions precedent to the maintenance of this action have been performed, have occurred, or have otherwise been waived.

### COUNT I
### VIOLATION OF ILLINOIS CONSUMER FRAUD AND
### DECEPTIVE BUSINESS PRACTICES ACT

72.     Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 71 above as if fully set forth herein.

73.     This claim is brought pursuant to 815 ILCS 505/1, *et seq*., commonly referred to as the Consumer Fraud and Deceptive Business Practices Act (the "Act").

74.     The Plaintiffs and the Class Members are Consumers within the definition of 815 ILCS 505/1.

75.     DuPont has engaged in deceptive and unfair acts or practices in the conduct of its business, which acts are unlawful pursuant to 815 ILCS 505/2.

76.     DuPont has committed a willful violation of the Act.

77.     For decades, DuPont has had possession of medical and scientific evidence indicating that Teflon coated cooking products pose a potential risk to human health.

78.     DuPont knew or should have known that Teflon coated cooking products, used in a normal and foreseeable manner, are potentially harmful to consumers

79.     Despite this knowledge, DuPont did not disclose to consumers that products containing Teflon were or are potentially harmful to consumers.

80.     Indeed, DuPont has stated repeatedly that both Teflon and PFOA are innocuous substances.

81.     DuPont intended for Plaintiffs and other Class Members to rely on DuPont's deceptions.

82.     DuPont's deceptive acts occurred in a course of conduct involving trade or commerce.

83.     As a direct and proximate result of the foregoing, Plaintiffs and other Class Members have been damaged.

**WHEREFORE,** the Plaintiffs, on behalf of themselves and the Class of similarly situated consumers, demand Judgment against DuPont and seek injunctive relief requiring DuPont (i) to create a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon; (ii) to provide a warning label on cooking products containing Teflon regarding the potential adverse and harmful effects of using Teflon coated cooking products, and (iii) to pay

plaintiffs an award of compensatory damages, interest, costs, and attorneys' fees; the imposition of civil penalties as allowed by statute, including punitive damages, and an award of such other and further relief as this Court deems just and appropriate.

## COUNT II
## UNJUST ENRICHMENT

84.     Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 83 above as if fully set forth herein.

85.     Throughout all times pertinent to this complaint, DuPont has had knowledge of significant potential health risks associated with the normal, intended and foreseeable use of Teflon-coated cookware.

86.     Despite its knowledge of such health risks, DuPont chose not to disclose to Plaintiffs and other members of the Class the information that it had regarding such risks.

87.     As a result of DuPont's wrongful and knowing failure to disclose the potential health risks associated with Teflon-coated cookware, Plaintiffs and members of the Class were induced to purchased Teflon-coated cookware.

88.     DuPont, meanwhile, has unjustly benefited from its fraudulent concealment, as it has retained profits estimated to be approximately $200 million per year.

89.     Based on DuPont's knowing deception of Plaintiffs and members of the Class, it would violate fundamental principles of justice, equity and good conscience for DuPont to retain the benefits that it has derived from the sale of Teflon-related cookware.

**WHEREFORE,** the Plaintiffs, on behalf of themselves and the Class of similarly situated consumers, demand Judgment against DuPont for restitution of all revenues that DuPont derived from the sale of Teflon-related cookware to Plaintiffs and Class Members, or alternatively, damages in an amount to be determined at trial, punitive damages, interest, costs, and an award of such other and further relief as this Court deems just and appropriate.

<div style="margin-left:40%">

Respectfully submitted,

Carmen D. Caruso (ARDC No. 6189462)
Edward S. Weil (ARDC No.  6194191)
Bryan R. Sup (ARDC No. 6238204)
Roberto Anguizola (ARDC No. 6270874)
SCHWARTZ, COOPER, GREENBERGER &
KRAUSS, CHTD.
*Counsel for Plaintiffs*
180 North LaSalle Street, Suite 2700
Chicago, Illinois 60601
Telephone:     (312) 346-1300
Facsimile:      (312) 782-8416


KLUGER, PERETZ, KAPLAN & BERLIN, P.L.
*Counsel for Plaintiffs*
Miami Center, 17th Floor
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone:     (305) 379-9000
Facsimile:      (305) 379-3428


Kimberley K. Baer      PK0014675
Steven P. Wandro       PK0008439
WANDRO, BAER & APPEL, P.C.
*Counsel for Plaintiffs*
2501 Grand Avenue, Suite B
Des Moines, Iowa 50312
Telephone:     515/281-1475
Facsimile:      515/281-1474

</div>

By:___s/ Kimberley K. Baer_____
       Kimberley K. Baer, Esq.


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via Electronic Mail and a true and correct copy of the Certificate of Service (only) furnished via U.S. Mail to: **Adam L. Hoeflich, Esq.**, (adam.hoeflich@bartlit-beck.com) Bartlit Beck Herman Palenchar & Scott LLP, 54 W. Hubbard Street, Chicago, IL 60610l; **Robert Fanter, Esq.**, (fanter@whitfieldlaw.com) Whitfield & Eddy 317 Sixth Avenue, Suite 1200, Des Moines, Iowa 50309 and **John Sherk, Esq.**, (jsherk@shb.com) Shook Hardy & Bacon LLP, 2555 Grand Blvd., Kansas City, MO 64108  this 8th day  of May 2006.


By:_____s/ Kimberley K. Baer_____
       Kimberley K. Baer, Esq.